## THE LOUISIANA STATE BANK *v.* LEDOUX.

Defendant bound himself as surety on a bond in favor of a bank, which recited that : " Whereas J. D. has been appointed note clerk, to continue in office during the will of the present, or

---

any future board of directors of the said bank : now the condition of this obligation is that if the said J. D. shall well, truly, and faithfully do and perform the duties of said office of note clerk, shall render a faithful account of all monies and effects committed to his charge or under his control, and generally shall save the said bank harmless on account of any negligence or misconduct of him the said J. D., then this obligation to be void, else to remain in full force." The directors of the bank were elected annually. D. embezzled from the bank a sum exceeding the amount of the bond, but no part of it was taken until more than twelve months after his appointment. In an action against the surety on the bond : *Held,* that the office was not an annual one ; that it does not follow because the directors are to be elected annually, that the clerks and servants of the bank hold their office by the same tenure, they being clerks and servants of the corporation and not of the directors who appoint them ; that the bond itself shows that the surety contemplated the continuance of D. in office beyond the year; and that the fact of the defalcation occurring more than twelve months after the appointment cannot discharge the surety. Nor will he be discharged by the mere fact of a neglect of duty on the part of the cashier of the bank, in consequence of which the clerk was enabled to embezzle funds of the bank, where there was no knowledge by the directors of such neglect, and no fraud on their part. The by-laws of the bank providing for periodical examinations of its affairs formed no part of the contract with the surety ; they are merely directory to the managers of the bank.

Where the surety in a bond given for the faithful discharge of the duties of an officer of the bank, on being informed by the bank of an embezzlement committed by the officer, before paying any portion of the amount embezzled, requires the bank to arrest the principal under the stat. of 28 March, 1840, and the bank refuses to do so, the surety will not, in the absence of any indication of a fraudulent connivance at the escape of the clerk, be thereby discharged. C. C. 3030. It was the duty of the surety, if he desired to avail himself of the chances of a restoration of the amount embezzled resulting from an arrest of the principal, to have paid the amount for which he was liable, and to have exercised himself the rights of the bank.

Interest will be allowed from judicial demand ¡on the amount found due to the plaintiffs in an action against the surety on the official bond of the officer of a bank, for an amount embezzled by the latter from the bank.

APPEAL from the Fifth District Court of New Orleans, *Buchanan,* J. *Grima,* for the appellants. *R. Hunt* and *Grymes,* for the defendant. The judgment of the court was pronounced by

SLIDELL, J. The defendant, *Ledoux,* became the surety of *James Duplessis,* who was appointed note clerk of the bank, on the 26th February, 1840. The bond, by which *Duplessis* and his two sureties, *Ledoux* and *Durrive,* bound themselves *jointly and severally,* bears date 29 February, 1840, and is for the sum of $12,000. It declares that : " Whereas *James Duplessis* had been appointed note clerk, *to continue in office during the will of the present, or any future board of directors of said bank ;* now the condition of the above obligation is such, that if the said *James Duplessis* shall well, truly, and faithfully do and perform all and singular the duties of said office of note clerk, shall render a faithful account of all monies and effects committed to his charge, or under his control, and generally shall save the said Louisiana State Bank harmless from or on account of any negligence or misconduct of him, the said *James Duplessis,* then this obligation to be void, or else to remain in full force and virtue." *Duplessis* embezzled from the bank at different times, in the years 1841, 1842, and 1843, an amount exceeding $12,000 ; and the present action is brought to recover from *Ledoux* the amount of the bond, with interest from judicial demand.

Several grounds of defence have been presented by counsel, which we shall consider in the order adopted in argument.

I. The petition admits that the first amount embezzled by *Duplessis* was taken on the 30th day of March, 1841, and consequently that he discharged his

duty faithfully until that time. It is contended, therefore, that, under the bond, the defendant is not liable; because, at the date of the first defalcation, his appointment had expired; that his office was an annual office, and that his sureties were bound for one year only.

If the place to which *Duplessis* was thus appointed was an annual office, there might be some plausibility in the conclusion invoked by the defendant. It is proper, therefore, to inquire whether the premises assumed are true. If we look merely to the language of the bond, it is obvious that the contracting parties did not contemplate a duration thus limited. On the contrary, it points to the expected continuance of *Duplessis* in office, " during the will of the present, or any future board of directors." Under the charter the directors were to be elected annually. A limitation to a year is, therefore, inconsistent with a continuance in office during the will, not merely of the next succeeding, but of *any future*, board. Confining our inquiry to the words of the contract in ascertaining its intention, it would be impossible to recognize the limitation claimed.

But it is said that sureties are the favorites of the law; that their contracts are scanned with great strictness; and though the words of the bond may cover an indefinite period, yet if, by an act of the legislature, or by the records of a corporation, it appears that the office was annual, the obligation must be understood as referring to an office so limited. We are not prepared to recognize the doctrine applicable to offices which may properly be denominated *public*, as extending unqualifiedly to appointments like that in question; nor to say that, in the case of such an appointment, even if it were annual, sureties might not be held bound for the good conduct of the principal under future appointments, if the intention to do so clearly resulted from the terms of the obligation. Upon this point, however, it is unnecessary to express an opinion. Conceding the right to limit the construction of this bond by the charter of incorporation and the by-laws of the bank, we proceed to consider the argument of counsel with reference to that hypothesis, and to inquire whether the place held by *Duplessis* is to be considered as an annual office.

The argument presented is mainly deduced from the provisions of the charter with regard to the election of directors. It provides that the directors of the bank shall be annually elected, and forbids the reëlection of more than two-thirds of the directors in office at the time of each annual election, permitting no director to hold his office more than three years out of five in succession. But it does not follow from this legislation with regard to the board of directors. that the mere clerks and servants of the corporation should hold their appointments by the same tenure. If these clerks and servants were to be considered the mere clerks and servants of the directors who appoint them, the conclusion might be a reasonable one. But we do not so regard them. They are the clerks and servants of the corporation; and the limited term of service of the directors does not control the duration of such appointments. It is proper to add that there is nothing in the by-laws of the bank limiting the duration of the place of note clerk, and his appointment itself was general.

The views which we have stated are not merely expressive of our own convictions, but rest upon high judicial authority. The subject was considered in the case of *Anderson* v. *Langdon*, 1 Wheaton, 91. A number of persons had associated themselves and formed a company for the purpose of encouraging the manufacture and use of domestic merchandize. By the articles which they adopted for their government the directors were to be chosen annually; and the affairs of the company were to be carried on under the control and

<div style="float:right">Louisiana<br>State Bank<br><i>v.</i><br>Ledoux.</div>

superintendence of the board thus elected.  ·They were to appoint an agent and such other officers as might be requisite, who were to hold their offices during the pleasure of the board, and to give bond for the faithful discharge of their duties.   The company having proceeded to elect directors, one *McLeod* was appointed agent by them, in February, 1810, and gave bond in favor of the then directors, with *Anderson* as his surety, conditioned for the faithful performance of his duties according to the terms and meaning of the articles of association, etc.   He continued in service without any new appointment till June, 1812, when he was dismissed; and having gone out in arrears to the company, the suit was brought against the surety to recover the amount due.   Among other matters of defence, it was pleaded that the agent was appointed on the 13 February, 1810, and that, for one year from the time of such appointment, and during the time the plaintiffs acted as directors, he had faithfully executed and performed his duty.   To this plea it was replied that he had continued in office for more than one year under the appointment, etc., to which the defendant demurred.   In argument the case of the *Commonwealth* v. *Fairfax*, was cited, where the words "so long as they shall continue in office" in the condition of a sheriff's bond, were considered not to extend to a second and new appoint-ment.   Chief Justice Marshall, in delivering the unanimous opinion of the court, said:  " The case of the sheriff's bond is very different.   The commission of sheriffs in Virginia is annual: of course his sureties are bound for one year only.   It is true the directors of the company are elected annually, but the company has not said that the agent shall be for one year only ; his appointment is during plea-sure.   The sureties do not become sureties in consequence of their confidence in the directors, but of their confidence in the agent whose sureties they are."

In the case of the *Union Bank* v. *Ridgely*, the suit was upon a cashier's bond, who had been appointed without any specific duration of his office having been fixed.   By the charter, the directors were to be appointed annually, a portion by the State and a portion by the stockholders.   Not more than eleven directors in office were eligible for the next succeeding year; and no director having served for three years successively, could be eligible for the two succeed-ing years thereafter.   As breaches of the bond, embezzlements were assigned at various times between the date of the bond, March, 1805, and the year 1819.   It was then urged in a very elaborate argument, that the cashier was one of the servants under the directors, to enable them to execute the business of the cor-poration : that the business of the corporation was  to be managed by these directors, until the first monday in July, 1805, and no longer, provided the new election took place on that day ; that as the president and directors were ap-pointed for a limited time, and to perform certain duties, and the cashier was a deputy or servant under them to aid in the performance of their duties, his appointment could not endure longer than that of the appointing power; that they could give no greater power to their servant, the cashier, than they them-selves had ; that the law might authorize them to appoint for a longer time ; but as it did not profess to confer such a favor, the question must depend upon the general doctrine of principal and deputy.   But these propositions were urged ineffectually, and were distinctly negatived by the court, after a careful analysis.   See 1 Harris and Gill's Maryland Reports, p.432.   It was held that the cashier's office was limited only by the duration of the charter, subject to the removal of the incumbent by the directors, as occasion might require, and that he was not necessarily an annual officer.

The same doctrine was maintained in the case of the *Dedham Bank* v. *Chick-ering*, 3 Pickering, 340.   There the cashier's bond was conditioned, for the

LOUISIANA
STATE BANK
*v.*
LEDOUX.

faithful performance of his duties " so long as he shall continue in office." It was dated in April, 1814. The entry of his appointment was that: "At a meeting of the directors, on the 25th March, 1814, *Chickering* was chosen cashier of the bank; " so that no duration was expressed. By the charter the directors were chosen annually. The defalcation occurred in ,1823. It was held that the words of the bond were general, that there was nothing in it to show that a restriction was intended, and nothing in the records or regulations of the bank indicating that the office was annual.

Much stress has been laid by counsel upon the expressions used in the fifth section of the charter, which is in these words:

" That in their first meeting, the directors shall appoint by ballot one of their members for their president, and he shall continue in office during one whole year. Whenever a vacancy shall occur, either through a change of residence by leaving the State, death, resignation, bankruptcy, or any other cause, prior to the last monday of January, in every year, directors shall have that vacancy filled up by a stockholder, having the qualifications required by this law to be a director, and the acting directors shall appoint all such officers, agents and servants, as are necessarily appurtenant to the operation of the said bank; and shall allow to each of them, as well as to the president, such salary or compensation as they may think proper."

If the legislature had intended that the clerks and servants of the bank should be appointed annually—that the duration of their office should be for one year only, it is surprising that this should have been left to mere implication. They had expressly provided for the annual appointment of directors in the section preceding. In this very section the office of president was expressly made an annual office. The lawgiver seems to us to have considered the subject of legislative limitation material only with regard to those who were to govern and control the institution, leaving the matter as to the agents and servants of the corporation to the discretion of the governing power, who were, in this very section, authorized to make by-laws for the better administration of their affairs. Of these agents the cashier is a very important one, and we find provision is made in the charter with regard to his bond; but nothing is said as to the duration of his office; no qualifications, as in case of directors, are prescribed; and no provision, as in their case, that he is to hold over in case no election is made on the day fixed. Yet the same clause which grants the power to appoint the cashier, provides for the appointment of clerks. As regards appointment, they all stand on the same footing.

The expression " *acting directors* " does not appear to us to aid the construction contended for. These words are equivalent to, or at any rate are not more favorable to the defendant than, the expressions in the charter of the Bank of Maryland—"the directors for the time being shall have power to appoint a cashier, and such other officers and servants, etc." In *Ridgely's* case, already cited, these words were commented upon, and it was very properly held that they must be understood as meaning only that, whenever for any reason the appointment of a cashier should be necessary, the then board of directors should be authorized to appoint.

· It is said, however, that, in this case, there was a reappointment of *Duplessis* : and the counsel rely, to show this fact, and as indicative also of the construction put by the directors themselves upon the charter, upon an entry in the minutes of the board under date of 3d March, 1841. It is in these words : " *Mr. Reynes* moved that the officers and clerks of the bank be confirmed in their respective

situations, which was agreed to unanimously." This resolution is fully susceptible of being construed into an expression of the will of the board that the clerks and servants of the bank should continue; as an approval of past appointments, and not a new appointment. Such is, indeed, the fair import of the language, and the opposite interpretation is strained. If, however, it could be treated as an appointment, and not as an approval, it was an unnecessary and superfluous act. *Duplessis* would have remained in office without it, and it cannot be considered, especially under the broad expressions used in the bond, as destroying the liability of the surety. In the case of the *Dehham Bank*, already cited, three successive " *reëlections* " of the cashier, expressly so deno· minated on the minutes, took place. But the point was considered, and disregarded.

We find nothing in the authorities cited at bar which conflict with the view we have taken as to this point of the defence. They are easily distinguishable from the case before us. In the case of *The Liverpool Water Company* v. *Atkinson*, 6 East. 507, the bond commenced by a recital that the principal had agreed to collect and receive the rents of the company from time to time, for twelve months from the date thereof, and the condition was, if the defendant should from time to time and at all times thereafter, during the con-. tinuance of such his employment, use due diligence, pay over, etc. The defalcation occurred after the expiration of twelve months. It was held that the obligation was confined to the period of twelve months mentioned in the recital; and very reasonably, for the surety reading the whole instrument would naturally understand that he was to answer for his principal for that specified period. So in *Lord Arlington* v. *Minicke*, 2 Saunders, 411, the bond recited that the plaintiff had appointed P. to be his deputy postmaster, for six months. The generality of the condition for fidelity, during all the time he should continue deputy postmaster, was held to be governed by the recital. In the *Wardens of St. Saviour's* v. *Bostock*, it was admitted by the replication that the principal's office, that of collector of parish rates, was an annual office. 5 Bos. and Pull. 177. In the *United States* v. *Kirkpatrick*, the commission of the public officer, in conformity to the provision of the act of Congress, was, by express terms, limited to continue to " the end of the next session of the Senate and *no longer*," and the bond in question was given with express reference to that commission. Hence the court held that, its obligatory force was confined to acts done while that commission had a legal continuance, and could not go beyond it. There was in that case also a new commission, different in date and nature. The case of the collector of poor and church rates, in 2 Bingham, 32, *(Leadly v. Evans,)* was also the case of an annual office, so fixed by law. So also in *Bigelow* v. *Bridge*, 8 Mass. 276, the office of the principal, a county treasurer, was annual by statute.

In conclusion, we remark, that we concur with the plaintiff's counsel in the opinion that the defendant could not have misunderstood the terms of the bond; and must have considered himself as becoming responsible for *Duplessis'* honesty, as long as the bank should think proper to employ him, in the capacity designated in the instrument. This is the plain and natural construction of the language used.

II. The next ground of defence taken by *Ledoux* is, "that he is discharged from all liability to the plaintiffs, because the bank, although called on by the defendant to take legal steps against *Duplessis*, refused to do so, and allowed him to abscond."

The facts material in the consideration of this point are that, on sunday, the 29th October, 1843, the first discovery of a deficit in *Duplessis'* account was made by the cashier. A part only of the deficit ($2,600,) was discovered. On the day following, when *Duplessis* came to the bank, the cashier told him of this deficit, when he appeared surprised, and said he would settle his account. The cashier waited, and at twelve o'clock of that day *Duplessis* left the bank without settling his account, returned before three, and then left the bank and never returned. The cashier communicated the discovery on the same day to the president, and a special meeting of the board was called for tuesday morning, when the cashier was directed to make a thorough examination of *Duplessis'* account, which examination was not finished till friday night, the 3d November. On tuesday, the 31st October, the cashier, by order of the board, addressed a letter to *Ledoux*, through *Hall*, the agent of *Ledoux*, then abroad, stating that he had discovered that *Duplessis* was a defaulter, so far as ascertained, to the amount of $2600, and that if, upon a thorough examination then in progress, a further responsibility should be discovered it would be immediately communicated. This letter appears to have been handed to *Hall* on the day of its date; and on that, or the following day, *Hall* called on the cashier and enquired if *Duplessis*, had been arrested, and was answered that he had not been. "Witness (*Hall*) in substance stated, he thought it the duty of the bank to arrest him, and unless the bank had him arrested, he as agent of *Ledoux*, did not feel authorized to pay the amount. Witness then offered the cashier to pay the amount of the defalcation then claimed as agent of *Ledoux*, if the bank would take steps to have *Duplessis* arrested. The cashier said he did not think it his duty, or that of the directors, to have *Duplessis* arrested, but that a special meeting of the board would be called that evening for the purpose of submitting witness' proposition to them. At the next interview, between the 31st October and 4th November; 1843, he saw the cashier again, who said that the matter had been submitted to the board, who stated "that they had nothing to do with it." The witness also deposed that, "*Ledoux*, being absent, witness was not aware whether or not the signature to the bond was genuine; and in offering to pay the defalcation as then claimed, he stated to the cashier that any thing he witness would do, would be subject to the ratification of the signature to the bond by *Ledoux*"; that he offered to draw a check the same day, or the day after the letter was received; that he was told some days after by *Duplessis'* brother that he was still in town. *Duplessis* absconded, but on what day does not appear. There is no proof that he left any property. On the 4th of November another letter was addressed to *Ledoux*, stating that although the investigation was not completed, a deficit to the full amount of the bond appeared.

The defendant relies on article 3030 af the Civil Code, which is the same as article 2037 of the Napoléon Code, and upon the opinions of certain of the french commentators and tribunals as to its just intendment.

Under the roman law it seems that, the refusal of the creditor to sue upon the request of the surety would not operate the surety's discharge. " Si fidejussor creditori denunciaverit, ut debitorem ad solvendam pecuniam compelleret, vel pignus distraheret, isque cessaverit : an possit eum fidejussor doli mali exceptione summovere ? Respondit non posse." L. 62, ff. De Fidejuss. "Although it be the interest of the surety that the creditor should recover payment from the debtor, yet he cannot oblige the creditor to sue him for it. For the creditor may defer the discussion of the principal debtor without losing

the security which he has taken by having another person bound for the debt." Domat, book 3, tit. 4, sec. 2, art. 5.

If we look to the litteral language of art. 2037 of the Code Napoléon and the corresponding article of our Code, it would require an *act* of the creditor to discharge the surety: "The surety is discharged when by the *act* of the creditor the subrogation to his rights, mortgages and privileges can no longer be operated in favor of the surety." The subject, however, has given rise to much controversy. The distinction has been raised between a positive act and an omission. The high authority of Pothier and Toullier is in favor of the opinion that the creditor is affected by positive acts, and not by a simple omission, while some other distinguished commentators hold him liable in certain cases at least of omission, such as the neglect to make a seasonable reinscription of a mortgage. Without adopting either of these conflicting theories in their full extent, we are of opinion that, under the circumstances of the present case, there has not been such an omission as would authorize us to consider the surety discharged.

The surety was promptly notified of the defalcation. If he desired to have *Duplessis* arrested under the act of 1840, it was fully in his power to have obtained an order of arrest, by paying the bank. The bank had done nothing as regards *Duplessis* to disqualify itself from exercising the right of arrest. It cannot be said that, by reason of any thing which had occurred, the surety on paying would have found himself incapable of exercising any right which the bank had ever possessed. The omission charged is the mere omission to exercise a right of action or suit, to which, in the particular case, the law accorded the auxiliary remedy of a restraint of the debtor's person. The argument is, that if *Duplessis'* person had been taken, he would either have given bail or remained in prison: that if he had given bail and then departed, the bail would have been bound, and a new surety thus acquired, the benefit of which would have accrued to the defendant; that if he had, on the contrary, not chosen or been able to give bail, incarceration might have induced him to disgorge what he had embezzled, or some portion of it. But we cannot destroy the contract of the parties upon these vague probabilities. The chances were within the reach of the surety; and it was his duty, if he desired to avail himself of them, to pay, and take the weapons of the law into his own hands.

In *Boutte* v. *Martin*, 16 La. 136, the point in question was considered. The suit was against two sureties on a note, and Judge Martin there said: "The defence of the appellant was that the plaintiff had neglected to sue the principal in the note, although earnestly urged to do so, and that he had indulged him with a prolongation of the day of payment. The first plea was correctly disregarded. It is an idle one. The creditor generally requires security to avoid suing the debtor; and the surety cannot require, before the creditor resorts to him for payment, that he should sue the principal. If he wishes the principal to be sued, he must pay the debt, and then exercise the rights of the creditor, to which payment subrogates him; or proceed according to art. 3026 of the Louisiana Code to be indemnified by the principal debtor." See also the case of *Cougot* v. *Fournier*, 4 Rob. 420.

It is said that the defendant had not sufficient information to justify him, *in foro conscientiæ*, in making the affidavit for arrest, even if he had paid the bond. The argument seems to us unsound. The bank gave him prompt information of the discovery of irregularities in the clerk's accounts. They informed him that a thorough examination was in progress; they notified him, as soon as it was

ascertained, fhat the defalcation exceeded the bond.   It is not pretended that there were any other sources of information than the books and records of the bank, nor that the defendant, if he had applied for permission to examine them, would have met a refusal.   Such an examination, which in law the bank would have been bound to permit, would have afforded him the same means to take the oath conscientiously, as the cashier or president possessed.

If, under the evidence, we could discover indications of a fraudulent connivance at the escape of *Duplessis*, the case might perhaps present a different legal aspect.   But the testimony does not authorize that inference.   It is negatived by the prompt notice given to the surety.

In the consideration of this question we have examined the authorities of the courts of common law and chancery.   Under that jurisprudence it would seem, according to some of the authorities, that the neglect to sue, even upon a request *en pais*, would be a good defence; but with this qualification, that it must be shown that the surety has been injured, and that at the time of the request the principal was solvent, and subsequently became insolvent.   The reluctance with which the doctrine, even thus guarded and qualified, has been adopted in some courts of the Union, may be ascertained by reference to a few noted cases.   In *King* v. *Baldwin*, 2 Johnson, Cha. Cases, 561, Chancellor Kent, in a very elaborate opinion, held that a surety was not discharged by a demand *en pais* upon the creditor to sue the principal.   His decree was afterwards reversed in the Court of Errors, but, under what circumstances, may be seen by the report of the case in 17 Johnson, 385.   In *Warner* v. *Beardsley*, the chancellor, with the result of whose opinion the court unanimously concurred, thus comments upon the reversal of Chancellor Kent's opinion : " Though Chief Justice Spencer afterwards succeeded in this court, 17 John. 386, in reversing the decree of the chancellor, it was in opposition to the votes of all the other justices of the Supreme Court who took part in the decision. The decision was made by the casting vote of the president against the opinions of some of the most distinguished lawyers in the State, who were then members of this court as senators.   It also stands in opposition to the decisions of most, if not all, the States in the Union, where the question has arisen."   After thus reluctantly acceding to the opinion of the Court of Errors in *King* v. *Baldwin*, as a binding authority, he observes : " I am not, however, disposed to carry its principles any further, or to extend it to cases in which the facts are materially different.   To bring a case within that decision, it is necessary for the surety to show that the principal was *solvent* at the time he requested the creditor to proceed and collect the debt, and was within the jurisdiction of the State, and that the creditor, without any reasonable excuse, neglected or refused to proceed until the principal debtor became insolvent and unable to pay."   8 Wendell, 199.

It must not be forgotten in the consideration of this subject that, our Code has made a very liberal provision for the surety, and has put into his hands very enlarged means of self-protection.   " Article 3026.   A surety may, even before making any payment, bring a suit against the debtor to be indemnified by him : 1st.   When there exists a lawsuit against him for payment.   2d.   When the debtor has become a bankrupt, or is in a state of insolvency.   3d.   When the debtor was bound to discharge him within a certain time.   4th.   When the debt has become due by the expiration of the term for which it was contracted.   5th.   At the expiration of ten years, when the principal obligation is of a nature to last a longer time, unless the principal obligation, such as that of

guardianship, be of a nature not to be extinguished before a determinate time."

A very liberal interpretation of this provision was given in *Cougot* v. *Fournier*, 4 Rob. 420. There *Fournier* was the surety of a curator who had administered unfaithfully; and, having converted the funds of the estate to his own use, made *a cessio bonorum*. The surety resisted a suit upon the bond, upon the ground, that the plaintiff ought to have opposed the surrender made by the curator to his creditors, as the claim was for a sum of money deposited in his hands in a fiduciary character; that such an opposition would have deprived the curator of the benefit of the insolvent laws, and prevented his discharge; and that the plaintiff's failing to make the opposition ought to have the effect of discharging the defendant from all responsibility as surety. But the court said, the surety, under art. 3026, was clearly competent to make the opposition himself, and to avail himself of all the objections that could have been made by the creditor. They also observed that the effect of the surrender did not go further than to discharge the debtor from imprisonment.

If, however, this court were permitted, in disregard of the opinion in *Boutte* v. *Martin*, to consider the refusal to procure the arrest of *Duplessis* as affecting the liability of the surety, to what extent could it possibly be affected? Certainly only to the extent that the surety could establish injury. This results very clearly from the analogy of the law on the subject of discussion. Overlooking the fact that *Ledoux* was bound *in solido*, and not expressing any opinion as to his right of discussion, let us suppose that he had, upon being sued, claimed the right of discussion; what would have been his duty and his right in such case? His duty would have been to point out to the creditor the property of the principal debtor, and furnish a sufficient sum to have the discussion carried into effect. Civil Code, 3016. What his right would then be, is shown by the succeeding article: "When the security has pointed out property in the manner directed in the foregoing article, and has furnished a sufficient sum to have the discussion affected, the creditor is, *to the amount of the property pointed out—Jusqu'à concurrence des biens indiqués*—responsible to the security for the insolvency of the principal debtor, provided it has occurred through remissness in commencing proceedings." We hold it to be clear that the measure of relief for the omission, could not go beyond the injury sustained. See Troplong, Cautionnement, § 572. Here we have no proof of actual injury. The case is left upon conjecture, as already noticed. A large portion of the embezzlement took place months before. *Non constat*, that any thing could have been extracted of the last embezzlement; no tangible property of *Duplessis* is shown; and even that his person was not, at the trial of this cause, within the jurisdiction of the court, does not appear.

III. The next ground of defence is: "That *Ledoux* has been discharged from all liability on the bond, in consequence of the gross neglect of the plaintiffs to perform the conditions expressed and implied which were incumbent upon them, and which formed the consideration of his contract as surety."

In support of this point the defendant relies upon the by-laws of the bank, and the testimony of the cashier. These by-laws require the cashier to take charge of the cash, daily to examine the settlement of the cash accounts of the bank, and, in case of material disagreement, to report the same at the next meeting of the board; to lay before the board, at each of their meetings for discount, a general statement of the accounts of the bank. They also require, as to the directors, that a committee of three shall visit monthly the vault in

which the cash and other effects shall be deposited; cause an inventory to be made of the same, to be compared with the books, in order to ascertain whether they perfectly agree therewith, and shall report the result of such examination to the board. A semi-annual balancing of the books was also directed, the settlement to be examined and certified by a committee of the board.

It is not pretended that the cashier ever discovered any irregularity in *Duplessis*' accounts, before the 30th October; or that any report had been made by him before that time, which ought to have excited the suspicion of the directors. But it is contended that, if the cashier had discharged his functions with proper minuteness and accuracy, he would have discovered the frauds of the clerk. If the cashier did neglect his duty, and the directors knew it, the argument derived from the alleged remissness of the cashier might require consideration. But the mere fact of a want of due vigilance on the part of the cashier, unaccompanied by knowledge on the part of the directors, seems to us entitled to no weight. It cannot be said that if one servant of a bank neglects his duty, and by his carelessness permits another servant of the bank to commit a fraud, the surety of the fraudulent servant shall be thereby discharged. We shall, therefore, consider the point with reference to the conduct of the board of directors.

We think it satisfactorily proved that the frauds of *Duplessis* might have been discovered at an earlier period, if minute and searching vigilance had been exercised by the monthly and semi-annual committees. "It would require much labor," says the cashier, "to examine the items of the accounts thoroughly, but if that were done a deficit could be found out." He adds that, he supposes, in this case, that the committee were imposed upon by false entries. There is also reason to suppose that the clerk introduced into the bundles of notes fictitious notes, or perhaps papers labelled to represent them. In his books the frauds were attempted to be covered up by forced balances.

The enquiry into the effect of the facts above stated upon the legal rights of the parties resolves itself into two branches; of which the first is, whether those by-laws of the bank are to be considered as entering into the contract of the surety. They certainly are not referred to expressly in the bond. It was conditioned for the faithful performance of *Duplessis*' duties. There was no express qualification that the surety would be bound only in case the directors should vigilantly discharge their duty according to the by-laws of the bank. As between these parties we feel bound to say that, the by-laws are directory to the managers of the institution, and do not form a part of the contract with *Ledoux*. See Angell & Ames on Corporations, and the authorities there cited. The question then remains whether, under the terms of the bond itself, and the general principles of law as affecting the contract, the absence of minute vigilance on the part of the directors unaccompanied by fraud, discharges the surety.

*Ledoux* bound himself for the honesty of *Duplessis*, and he has been unfaithful. To say that the obligee has not exercised as rigid a surveillance over him as there might have been, is to interpolate in the instrument a clause which the parties did not adopt for themselves, and give it effect as though it had been, not a guarantee that *Duplessis* should be honest, but a guarantee that he should be honest if closely watched. If *Duplessis* had offered such a bond when he was appointed note clerk, can it be supposed for a moment that it would have been accepted? Clearly not. The language of Chief Justice Marshall, in the case already cited on another point, is very pertinent here;

"The sureties do not become sureties in consequence of their confidence in the directors, but of their confidence in the agent whose sureties they are." See also *The Trent Navigation Company* v. *Harley*, 10 East., 40. Angell & Ames on Corporations, 317. 2 Metcalf, 241. *United States* v. *Kirkpatrick*, 9 Wheaton, 737.

We have considered this case at length, because such an examination was due to the importance of the subject, the very elaborate manner in which it has been presented by counsel, and the verdict of the jury, who found for the defendant. We have been unable to concur in the verdict, and our deference to the finding of a jury cannot be carried so far as to overthrow our own clear convictions as to the law and facts, both of which it is our province to examine and pronounce upon. We must attribute the verdict to an erroneous conception of the legal effect of a want of exact and searching vigilance on the part of the cashier, and perhaps of the directors; and probably, the refusal to have *Duplessis* arrested contributed to turn their minds in favor of the surety, whose case is certainly unfortunate. We have expressed our views upon all these matters; and, in conclusion, may add that *Duplessis* would not have received the trust which he has violated, unless his honesty had been guarantied; and that in justice the burden of his misconduct must fall upon the party whose guarantee obtained for him the confidence of his employers.

It is, therefore, decreed, that the judgment of the court below in favor of *Amaron Ledoux* be reversed; and that the plaintiffs recover of the said *Amaron Ledoux* the sum of $12,000, with interest thereon from the 25th October, 1844, until paid, with costs of the proceedings in the court below, and of this appeal.