(89 South. 674)

No. 22843.

## BANK OF JEANERETTE v. DRUILHET et al.

(Oct. 4, 1921.)

*(Syllabus by the Court.)*

1. **Banks and banking** ⊜⇒108 — **Cashier's authority to make loans and permit overdrafts presumed only such as board of directors grant.**

In the absence of evidence to the contrary, it will be assumed that the authority to make loans and permit overdrafts is vested in the board of directors of a bank, and that the cashier is vested with only so much authority in that respect as the board may confer on him or knowingly permit him to exercise.

2. **Banks and banking** ⊜⇒108—**Cashier's authority by usage to allow overdrafts cannot be based on acquiescence in that of which the board was ignorant.**

Where the authority of a cashier to allow overdrafts and cash items is not conferred by the board of directors of a bank in specific terms, but is deduced from long usage, evidenced by the practice of the cashier, acquiesced in by the board, the measure of such authority, for the purposes of an action on the cashier's bond, is determined by the extent, conditions, and period to, under, and during which it was exercised; the board will not, in such case, be held to have acquiesced in that of which it was ignorant, or which had not happened.

3. **Principal and surety** ⊜⇒121, 161—**Suretyship; if directors know of cashier's practice of allowing overdrafts, their acquiescence therein will release surety on cashier's bond; directors' knowledge may be established by circumstances.**

Though the ignorance of the board of directors of a bank of a cashier's practice of allowing overdrafts may not release the surety of the cashier from liability for loss resulting therefrom, knowledge of, and acquiescence in, such practice will have that effect; and, though the knowledge may not be presumed merely from the relations of the parties, it may be established by convincing circumstantial evidence.

4. **Banks and banking** ⊜⇒150—**"Overdraft" defined and may be a legitimate method of borrowing or criminal.**

An "overdraft" is the act of checking out more money than one has on deposit in a bank, and it may be either a legitimate method of borrowing the money or an illegitimate and criminal method of obtaining it through the connivance of the person from whom it is obtained.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Overdraft.]

5. **Principal and surety** ⊜⇒79—**In bond use of words "wrongful abstraction or misapplication" without the words "willfully" or "with intent to injure or defraud" held to render surety liable in absence of criminal intent.**

In a suit by the liquidators of a bank against the cashier and his surety on a bond, the obligation of which is to pay the bank "such pecuniary loss, not exceeding $10,000.00, as said employer shall have sustained by any act of fraud, dishonesty, forgery, theft, embezzlement, wrongful abstraction, or misapplication on the part of said employee directly or through connivance with others," the use of the words "wrongful abstraction or misapplication," in the absence of "willfully" and "with intent to injure or defraud" (as contained in U. S. Rev. St. § 5209 [U. S. Comp. St. § 9772]), have the effect of extending the protection of the bond to cases in which losses are inflicted on the obligee by the wrongful misapplication of its assets on the part of the principal obligor, whether with criminal intent or otherwise; and there may be a recovery though the plaintiffs disclaim the intention of charging such principal obligor with a crime.

6. **Principal and surety** ⊜⇒123(2)—**Suretyship; in suit on cashier's bond plaintiff held to have complied with provision for notice of default.**

The conditions of a cashier's bond that notice of the loss shall be given to the surety within 10 days after its discovery, and details furnished within 3 months, are complied with when the liquidators of a bank begin a prompt inquiry, through an expert accountant, into its condition, report a probable loss as soon as the probability is ascertained, a definite loss within 10 days after they have assured themselves of its existence, and the details within 3 months thereafter, reporting progress from time to time, and receiving no complaint from the surety.

Appeal from Nineteenth Judicial District Court; Parish of Iberia; James Simon, Judge.

Action by the Bank of Jeanerette, in liquidation, against Frederick J. Druilhet and

another. Judgment for defendants, and plaintiff appeals. Judgment in so far as it rejected plaintiff's demand in toto, annulled, and judgment entered for plaintiff against the defendants Druilhet and the American Surety Company in solido for a certain amount, with interest thereon, and in so far as the judgment appealed from rejects demand for a further sum, it is affirmed; defendants to pay costs.

Burke & Smith, of New Iberia, for appellant.

Alpha & McGowen, of Jeanerette, for appellees.

### Statement of the Case.

MONROE, C. J. Plaintiffs, liquidators of the Bank of Jeanerette, bring up this appeal from a judment rejecting their demand against the defendant Druilhet and his co-defendant, the American Surety Company, principal and surety on a bond furnished by Druilhet as cashier of the bank; the cause of action, as alleged in the petition, being, in substance, that Druilhet, acting wrongfully and without authority, permitted himself and others to make and carry overdrafts and "cash items" against the funds of the bank in amounts aggregating $2,351.29. Druilhet does not deny the specified transactions, but alleges that they were known to the officers and directors of the bank and were entered, as they occurred, on its books. The surety company pleads a prescription based upon the stipulations of the bond, and estoppel, based upon the averments that the payment of some overdrafts and cash items is customary in all banks in this section; that the only difference between plaintiff and the others is that plaintiff carried the custom farther than the circumstances justified, and, long before it was compelled to close its doors, was known to be in a sinking condition, owing to the latitude its officials allowed its cashier and their failure to restrain him.

It appears from the evidence that for 16 or 18 years (probably, from the date of the bank's organization) Druilhet had been its cashier and Joseph F. Moore its assistant cashier, and that they had also been members of the board of directors; that during that entire period it had been the usage to allow overdrafts and "cash items," the persons to whom and the circumstances under which such accommodation should be granted having apparently been left a good deal to the discretion of the cashier, though no specific authority in that respect seems to have been granted to him. That the usage in question, as observed by the cashier, prior to a certain meeting of the board of the directors held on September 18, 1914, was known to the members of the board, and acquiesced in by them, the evidence leaves but little room to doubt; in fact, not less than five of the eight individuals who served in that capacity within the several years immediately preceding the liquidation of the bank are shown to have availed themselves of the accommodation thus afforded, and but one (Mr. F. J. De Gravelle) denies the possession of such knowledge. He says, in his testimony:

"I knew nothing about the overdrafts nor the cash items until the bank closed."

And the next question and answer read as follows:

"Q. Mr. Druilhet testified that you constantly overdrafted and were the largest debtor of the bank; is that a fact? A. No, sir; I owed to the bank $4,200, backed by $6,500 of good security. I overdrafted sometimes, but I always had the money in my safe to pay any overdrafts which I made."

Beyond that it is shown that Mr. De Gravelle was a director during the period that Druilhet was cashier; that quarterly statements of the condition of the bank were published in the local paper, and that there was included in each of them an item showing the aggregate of the overdrafts; that

the state bank examiner made semiannual visitations, and on such occasions called upon some bank official to assist him by valuing such assets as notes, overdrafts, and cash items, and that Mr. De Gravelle was the official who usually rendered that assistance; that he was also at times called on to make audits of the condition of the bank, and discharged that duty; that on several occasions within the 18 months or the year which preceded the closing of the bank the examiner addressed letters to the president in which (to use the language of the minutes of the directors' meetings) he called attention to "certain matters," which "certain matters," in the light of the oral evidence and in the absence of the letters, we interpret to mean the carrying of too many unsecured and doubtful notes, overdrafts, and cash items; that the overdrafts were regularly entered, in red ink in the accounts against which they were drawn, and attracted attention on a mere glance at the accounts; and that at a special meeting of the board of directors on September 18, 1914 (which was the last meeting preceding that on March 8, 1915, when the bank closed and went into liquidation), there being present L. A. Moresi, president, F. J. De Gravelle, Joseph F. Moore, and F. J. Druilhet, directors, the following business was transacted (quoting the minutes):

"The president submitted a letter of Mr. W. L. Young, state bank examiner, of date September 12, calling attention to certain matters as pointed out by Mr. Patton Hawkins, assistant state bank examiner [in his report] of his official examination of the bank of date September 8. After due reading of the letter, action on same was taken as per the following resolutions:

"It was moved by Mr. De Gravelle, seconded by Mr. Druilhet and carried, that the unapproved overdraft of Mr. Joseph F. Moore, assistant cashier, for $154.29, is hereby approved (Mr. Moore absenting himself and taking no part in the resolution). It was further moved by Mr. De Gravelle, seconded by Mr. Moore and carried, that the unapproved note of Mr.

F. J. Druilhet for $141.66 due October 1 be hereby approved and ratified (Mr. Druilhet absenting himself).

"The cashier was then instructed to obtain at once additional security for the loans of Druilhet & Mequet, and to collect or obtain renewals of all past-due notes."

It is shown that the Druilhet, of the firm of Druilhet & Mequet, was a brother of defendant herein, and that the firm was rather heavily indebted to the bank, and went, or was forced into bankruptcy within a few months, as we infer, after the board meeting above mentioned, with the result, as to the bank, that it collected a dividend of something over $900, but lost over $5,000. Another debtor of the bank was the Planters' Supply Company, a commercial partnership composed of the defendant Druilhet and his assistant and codirector, Moore. That concern had been overdrawn for nearly six months prior to the meeting of September 18, and on that day its overdraft amounted to $387.96. We gather from his testimony that the cashier was not successful in any attempt that he may have made to obtain either money or additional security from Druilhet & Mequet, but he nevertheless allowed that firm to increase its indebtedness to the bank by an overdraft of $183.33, and also between the meeting of September 18, 1914, and December 4 of that year he allowed the Planters' Supply Company to increase its overdraft from $387.96 to $1,636.56 (which was reduced to $1,346.71 by March 8, 1915). In addition to those matters, it appears that Druilhet, Moore, and Hayes (one-time director) were jointly indebted to a New Orleans bank, and that for the payment of his share of that debt, and for other matters personal to himself, Druilhet, after September 18, 1914, made use of overdrafts and cash items to the aggregate amount of $708.05, and allowed J. C. Thomas and E. A. Boudreaux to overdraw, respectively, in the sums of $1.50 and $9.99,

making a total of overdrafts and cash items allowed by him after the meeting of September 18, 1917, of $1,861.62.

Immediately following their appointment, the liquidators employed two expert accountants to examine the books of the bank and make a report of their findings, and, upon the basis of the information obtained from them their counsel on April 8, 1915, wrote to the surety company in part as follows:

"We have to advise that, while the liquidators are not able definitely to specify any loss at this date, it appears sufficiently probable that loss will arise from loans made by F. J. Druilhet, cashier, to the firm of Druilhet & Mequet, aggregating $7,010.99, the said firm being composed of parties of whom one is a brother of the cashier, and cash items charged against E. E. Hayes to the amount of $329.91, arising, as appears probable, from an amount paid for the said Hayes by the cashier on a joint obligation, and a further indebtedness against the Planters' Supply Company, composed of the cashier and the assistant, Mr. Joseph F. Moore, in the sum of $1,423.60, and the cashier individually in the sum of $333.55. The said liquidators put notice on you of the amounts and items hereinabove set forth."

On July 13 the counsel again wrote to the surety, recapitulating what had been said in their letter of April 8, and further as follows (quoting in part), to wit:

"* * * On behalf of the liquidators we have to advise that at this date we are not ready to specify for the reason that proceedings against that partnership [referring to the Planters' Supply Company] undertaken by various creditors are still pending, and we cannot determine the amount of the loss in order to furnish you with the details thereof. We advise that, with reference to the loans made to, and transactions had with, Mequet & Druilhet, we cannot at this date specify the losses for the reason that the officers of this firm are in the hands of the bankruptcy courts, and we cannot determine the amount of loss for which we will claim your liability in specific amounts. We wish to supplement the information heretofore given you in further advising that the amount of overdrafts of the parties above appears to have increased by $145.65, as we are advised by a further expert examination of the

books on July 9. We shall in due course furnish you with specific details as to this proposition, also with reference to the other matter," etc.

In a letter of September 2, 1915, the counsel furnished certain specific details and concluded by saying:

"From the amounts herein enumerated, and the litigation having been finally determined, we can now definitely state the loss, so far as ascertained, to aggregate the amount of $7,-214.37, and for which we request reimbursement under the terms and conditions of the bond."

And in a letter of September 21 counsel inclosed an itemized statement "inadvertently omitted" from the letter of September 2 of overdrafts and cash items in names of F. J. Druilhet and E. E. Hayes.

On July 23 the surety company had written to the counsel, saying, inter alia:

"We transmit claim blanks in triplicate for the use of the liquidators in presenting any claim they may have to make under the conditions of the company's surety bond. * * * For the time being we are obliged to state that we must proceed under the conditions of the bond."

In their letter to the surety company of September 20 the counsel wrote:

"We must respectfully decline to fill out the blanks which were sent to us * * * for the reason that we do not charge the cashier, Mr. Druilhet, or the assistant cashier, Mr. Moore, with any acts of embezzlement or theft. The form sent us deals especially with charges of this nature. Though we hold that the indebtedness about which we have written is covered by the terms of the bond, we do not charge that such indebtedness was due to acts criminal in their nature."

To which the company on November 1 replied that Mr. Druilhet denied liability and expressed his willingness to defend any suit brought against him, and further as follows:

"The conditions of the suretyship obligations of this company contemplate the payment of losses due to forms of dishonesty specified therein, which are infractions, in each instance, of the criminal laws of the state wherein the

losses occurred. This company disclaims any liability on the said bond for any of the items of the account transmitted, and again gives you notice that we cannot waive any of the conditions of the suretyship obligations which the principal in said obligations, Mr. Frederick J. Druilhet, has a right to demand shall be scrupulously observed."

### Opinion.

[5] The obligation and conditions (so far as here pertinent) of the bond sued are that the company will pay to the bank—

"such pecuniary loss, not exceeding $10,000.00, as said employer shall have sustained by any act of fraud, dishonesty, forgery, theft, embezzlement, wrongful abstraction, or misapplication on the part of said employee, directly or through connivance with others: * * * Provided, however, that loss be discovered during the continuance of this suretyship or within fifteen months next after its termination and notice thereof delivered to the surety at its home office in the city of New York within ten days after such discovery.

"(2) That claim, if any, be submitted by the employer in writing showing the items and dates of losses, and delivered to the surety at its home office within three months after such discovery."

Counsel for the surety company say in their brief:

"If the court will turn to the statute, being [section] No. 5209, U. S. R. S., it will see that the surety company considered that it was dealing with public wrong in the wording of its bond, in that, it was dealing with acts that the United States Congress had grouped as misdemeanors, punishable by imprisonment for not less than 5 years nor more than 10 years, which statute was uniformly known in all of the states of the Union. Therefore, when the surety company used in its bond the words 'wrongful abstraction or misapplication on the part of said employee.' it was copying as closely as possible the words in the statute. which are, 'who embezzles, abstracts, or willfully misapplies any of the money.' It appears that the surety company found the statute itself slightly defective, in placing the word 'willfully' after, instead of before, the word 'abstraction,' because the court will notice that the surety company not only uses the stronger word 'wrongful,' but places it before 'abstraction or misapplication,' so that the abstraction must be as wrongful as the misapplication.

149 LA.—17

"The surety company substituted the word 'wrongful' for the statutory 'willful,' and places it earlier in the sentence than the statute had the substituted word, apparently for the purpose of taking the place of the words of the statute, with intent, in either case, to injure or defraud."

We are not sure that we understand the argument of the learned counsel, but, if they mean that by the omission from the bond of the words "willfully" and "with intent to injure and defraud," as contained in U. S. Rev. Stat. § 5209 (U. S. Comp. St. § 9772), the bond was strengthened as protection against, and is definitely confined in its application to, losses by reason of criminal acts, we are unable to agree with them; our view of the matter being that, while the inclusion of that language in the statute confines its application to acts of a purely criminal nature, its exclusion from the bond extends the protection of that instrument to cases in which losses are inflicted on the obligee by the wrongful misapplication of its assets on the part of the principal obligor, whether with criminal intent or otherwise.

In Minor v. Mechanics' Bank, 1 Pet. 46, 7 L. Ed. 47 (decided in 1828), it was held by the Supreme Court of the United States, speaking through Mr. Justice Story, that, it having been for years the usage and practice of the bank to allow overdrafts, the court was constrained to presume that such usage, as observed by the cashier, was known to and approved by the president and directors, but that it was not within the legitimate power of the president and directors either to exercise or to confer such authority, and hence that the cashier and his sureties were liable to the bank for the loss resulting from the overdrafts allowed by him. Referring to the usage mentioned, the court said:

"It is a usage to allow customers to overdraw and to have their checks and notes charged up without present funds in the bank. Stripped of all technical disguise, the usage and

practice thus attempted to be sanctioned is a usage and practice to misapply the funds of the bank, and to connive at the withdrawal of the same without any security in favor of certain privileged persons.

"Such a usage and practice is surely [such] a manifest departure from the duty both of the directors and the cashier as cannot receive any countenance in a court of justice. It could not be supported by any vote of the directors, however formal, and therefore whenever done by the cashier, is at his own peril and upon the responsibility of himself and his sureties."

In Louisiana State Bank v. Ledoux, 3 La. Ann. 674 (decided in 1848), the Supreme Court of this state, through Mr. Justice Slidell, answering the argument on behalf of the defendant surety that, if the president and directors had been more vigilant, the frauds of the cashier might have been prevented, used the following language, to wit:

"Ledoux bound himself for the honesty of Duplessis, and he has been unfaithful. To say that the obligee has not exercised as rigid a surveillance over him as there might have been is to interpolate in the instrument a clause which the parties did not adopt for themselves, and give it effect as though it had been, not a guaranty that [he] should be honest, but a guaranty that he should be honest if closely watched."

In each of the cited cases there were false entries by the cashier and other conclusive evidences of deliberate fraud, and, in so far as the courts held that the negligence or lack of diligence on the part of the president and directors was an insufficient defense against the actions on the bonds of the cashiers, the same doctrine prevails to-day, 3 R. C. L. p. 486, § 114. In the case first cited, however, the court seems to have gone farther, and to have held it to be in the nature of a crime and beyond the authority of the president and directors of a bank, and a fortiori of a cashier, to loan the money of the bank without exacting security, and in that respect there has been a material change in the jurisprudence, if not the law, of the country. Construing the federal statute applicable to the national banks (including the section 5209 to which defendants' counsel refer), the Supreme Court of the United States has said:

"One branch of the business of a banking association is the discounting and negotiating of promissory notes, and this is to be done by its board of directors or duly authorized officers or agents. * * * There is no provision of the statute which forbids the discounting of a note not well secured, or both the maker and indorser of which are insolvent. It is within the discretion of the directors, or the officers or agents lawfully appointed by them, to discount such a note if they see fit, and it might, under certain circumstances, tend to the advantage of the association. * * * But, whether the discounting of the note was an advantage to the association or not, and whether the note was paid or not, is immaterial. If an officer of a banking association, being insolvent, submits his own note, with an insolvent indorser as security, to the board of directors for discount, and they, knowing the facts, order it to be discounted, it would approach the verge of absurdity to say that the use by the officer of the proceeds * * * would be a willful misapplication of the funds of the bank, and subject him to a criminal prosecution." U. S. v. Britton, 108 U. S. 192, 193, 2 Sup. Ct. 525, 27 L. Ed. 703.

The ruling so made appears to be considerably elucidated in later cases in which (quoting one of them) it is said:

"While the mere discount of an unsecured note, even if the maker and the officer making the discount knew it was not secured, would not necessarily be a crime, if the maker believed that he would be able to provide for it at maturity, yet, if his original intent was to procure the note to be discounted in order to defraud the bank, as charged in this count, every element of criminality is present. * * * The criminality really depends upon the question whether there was at the time of the discount a deliberate purpose on the part of the defendant to defraud the bank of the amount." Evans v. U. S., 153 U. S. 592, 14 Sup. Ct. 934, 38 L. Ed. 833.

[4] The overdraft is the act of checking out more money than one has on deposit in a bank; and it may be either a legitimate method of borrowing the money or a criminal method.

"In paying overdrafts," says the author of the article on Banks and Banking, 5 Cyc. 465, "the modern rule is different from the old one. Once to do this was a grave offense; now its propriety depends on the ability and worthiness of the depositor. It may intentionally be done as a loan, and under proper conditions is fully justified."

In U. S. v. Heinze, 218 U. S. 532, 31 Sup. Ct. 98, 54 L. Ed. 1139, 21 Ann. Cas. 884, it appeared that defendant, as president of a bank, was charged with the willful misapplication of its funds (being the proceeds of a note for $100,000 which he knew was not secured), with intent to defraud, etc., and, the indictment having been quashed on demurrer as not setting forth such conversion as to constitute the crime denounced by the statute, that ruling was reversed on writ of error. Among the notes appended to the case as reported in 21 Ann. Cas. we find the following under the subtitles "Particular Misapplications—Overdrafts," to wit:

"The payment of overdrafts by an officer of a bank is not an offense if, when the overdrafts are paid, there is lacking the element of willful misapplication to an unlawful purpose of the money of the bank or the intent on the part of the officer to injure or defraud it by such payments. Prettyman v. U. S., 180 Fed. 30, 103 C. C. A. 384.

"The overdrawing of his account, without the sanction of the directors, by the cashier of a bank by means of checks carried as cash in the drawer and taken up by the discount of an unauthorized note, is a willful misapplication within the meaning of the act. Brock v. U. S., 149 Fed. 173, 79 C. C. A. 121. * * *

"Standing alone, the mere overdraft of a bank account, even by the president, may not be a criminal act, and from it by itself one may not infer an intent to injure the bank. But when it is shown that at the date of the overdraft the bank was hopelessly insolvent, that it was made insolvent by reason of the fact that its assets were notes of wholly irresponsible persons, that these notes had been used by the president in connivance with his cashier, who was a director, and with another director, in order to give him a fictitious credit, and that it was used freely, there is room for the inference that the overdraft was made with intent to abstract or misapply the moneys, funds, and credits of the bank. Breese v. U. S., 106 Fed. 680, 45 C. C. A. 535, reversed on other grounds 108 Fed. 804, 48 C. C. A. 36. * * *

"An officer of a bank cannot be held guilty of an intent to defraud the bank in cashing checks drawn upon it by a person without funds or money or deposit against which to draw, if the officer acts in good faith, honestly believing that the drawer will be able to repay the money when required. Coffin v. U. S., 162 U. S. 664, 16 Sup. Ct. 943, 40 L. Ed. 1109."

As the cases thus cited deal with questions of criminal liability under federal statutes, they are not in all respects applicable here, where no criminal charge is made, and the question involved is one of civil liability under the state law. On the other hand, as the bond sued on is framed to a certain extent in the language of the federal statute, the cited authorities throw light upon the interpretation of that language.

[1] It will be assumed for the purposes of this case, and in the absence of evidence to the contrary, that the power to loan the money of the bank whose liquidators are before the court was vested in its board of directors, and that it was within their discretion to make such loans to such persons as they saw fit, so long as (being the agents of the corporation and of the stockholders collectively) they sought to serve each, promote the interest of their principals, and, so seeking, conducted the business with which they were intrusted in good faith and according to their best judgment. The cashier, as we understand the general rules governing such institutions, was not authorized, by virtue of his office, to make loans or allow overdrafts or cash items. Evans v. U. S., 153 U. S. 593, 14 Sup. Ct. 934, 38 L. Ed. 834, citing Bank of U. S. v. Dunn, 6 Pet. 51, 8 L. Ed. 316.

[2] But it was no doubt competent for the board of directors to vest in him certain discretionary power in such matters, the exercise of which was to be regulated with due regard to the capital of the bank, the

volume of its business, the character of the person accommodated, the state of his account, and the general condition of the money market. Inasmuch, however, as the authority of the cashier was not granted in specific terms, but is deduced from the acquiescence of the directors in its exercise by him, the measure of his authority is determinable by the extent, conditions, and period to, under, and during which it was exercised. It does not follow, for instance, that, because the directors acquiesced in his allowing his own firm (the Planters' Supply Company) to increase its overdraft during a period of six months, until it reached $387.96, that we are to deduce that they also acquiesced in his allowing a further increase within less than three months after the meeting of September 18, 1914, to $1,636.56; nor does it follow, because he may have loaned money to Druilhet & Mequet prior to that meeting, at which he was instructed "to obtain" at once "additional security" for their loans, that the directors intended to acquiesce in their being allowed to increase their indebtedness by an overdraft of $183.33; nor yet does it follow that, because at that meeting the directors approved the cashier's unapproved note for $141.66, they thereby intended to acquiesce in his subsequent overdrafts and cash items to an amount exceeding $700.

[3] We hold that the directors must be considered to have acquiesced in and authorized the overdrafts which preceded the September meeting of the board, not because they negligently failed to inform themselves concerning them, but because we conclude, from the circumstantial evidence to which we have referred, that they were informed, and (with one exception) they have failed to deny that they were informed, and we are unable to conceive how it could have been otherwise.

We hold that they cannot be considered to have acquiesced in the overdrafts and cash items that were allowed after the September meeting of the board, because it does not appear that after that event there were any published statements or audits of the condition of the bank, or any letters from the state bank examiner (though we imagine that there may have been one at the time of the last meeting on March 8, 1915, when the bank went into liquidation), in short, because we are satisfied that they were in ignorance that overdrafts and cash items were then being allowed, and would not have acquiesced therein, if they had been informed of them.

[6] The foregoing findings and reasons, we think, are sufficient to sustain the plea of estoppel, in so far as it may be addressed to plaintiff's claim as based on overdrafts which were allowed prior to the meeting of the directors on September 18, 1914, and to authorize the dismissal of that plea in other respects. The plea of prescription (or failure to comply with the conditions of the bond as to timely notice) is without merit. The correspondence between plaintiff's counsel and the defendant company shows that the former went about the work of ascertaining whether the bank had sustained a loss with the aid of an expert, and they were fortunate in being able to hazard an opinion and then reach a definite conclusion on that subject and provide the details when they did. They kept defendant informed of the progress they were making, received no complaint concerning it, and, we think, complied with the conditions of the bond.

It is therefore adjudged and decreed that, in so far as the judgment appealed from rejects plaintiff's demand in toto, it is annulled, and that there now be judgment in favor of plaintiff and against defendants, Frederick J. Druilhet and the American Surety Company of New York in solido, in the sum

of $1,861.62, with legal interest thereon from judicial demand until paid, and that, in so far as said judgment appealed from rejects said demand for any further sum than that so awarded, it is affirmed. It is further ordered that defendants pay all costs.

O'NIELL, J., concurs in the result.