No. ——

First Circuit

HERRIN STATE SAVINGS BANK v. CALMES AND HAGUE

(April 1, 1926, Opinion and Decree)
(May 4, 1926, Rehearing Refused)

(*Syllabus by the Editor*)

1. **Louisiana Digest—Mandate—Par. 89, 90; Estoppel—Par. 41, 51.**

Although the cashier of a bank had no authority to accept a transfer of the assets of a coal company for the bank and agree to release the endorsers on the coal company's note, the evidence showed that the bank had acquiesced in this action by liquidating the coal company's assets and applying the money to the note. This will estop the bank from collecting the balance due on the note from the endorsers.

Appeal from the Parish of East Baton Rouge, Hon. W. Carruth Jones, Judge.

Action by Herrin State Savings Bank against J. F. Calmes and L. S. Hague. There was judgment for defendants and plaintiff appealed.

Judgment affirmed.

W. G. Randolph and Fred G. Benton, of Baton Rouge, attorneys for plaintiff, appellant.

C. C. Bird and Chas. A. Holcombe, of Baton Rouge, attorneys for defendants, appellees.

MOUTON, J.    The defendants, Calmes and Hague, residents of East Baton Rouge, bought the Carterville Coal Corporation leases of a coal mine situated near Herrin, Illinois, and organized the Leah Coal Co., Inc.  Needing money to run the mine they borrowed nine thousand dollars from the plaintiff bank for which they executed a promissory note in favor of Wm. C. McCormick, trustee, on August 17, 1920.  This note was reduced by payments to the sum of four thousand dollars and for this amount, on August 15, 1921, the Leah Coal Company gave its promissory note to the Herrin bank, plaintiff.  To secure the payment of this note defendants made a trust deed in favor of the bank, and for additional security endorsed the note individually.  The note of $4000.00 was reduced by partial payments to the sum of $1505.00 for which this suit is brought against defendants on their personal endorsements, the Leah Coal Mine Co., having been dissolved and its affairs liquidated.  The operation of the mine not having proved a success, Hague, with the full consent of Calmes, his associate in the enterprise, was authorized to go to Herrin for the purpose of making a final disposition of the assets of the Leah Coal Company.  Hague went to Herrin where plaintiff bank is located and had a conference with Lyerla, its cashier, in reference to the amount due on the note sued upon.  A correct decision of this case depends upon a proper interpretation of what transpired at that conference and of the subsequent ratification thereof or acquiescence therein by the bank.

Hague says, that at this conference, Lyerla, cashier, who was acting for the bank, told him if he would transfer him the stock and leases of the Leah Coal Company, he would release defendants of all their indebtedness to the bank.  He says, he was alone with the cashier when this conference took place.  The version of the cashier on the other hand is, that Hague being desirous of disposing of his mining property came into the bank and asked if we would not act as his agent in assisting to dispose of his property near Herrin, and "apply its proceeds to their indebtedness".  He says, he agreed to use his best efforts in trying to dispose of the property and to apply the proceeds, as suggested.  He admits that Hague left a bill of sale with him and the stock certificates of the company endorsed in blank, and which were subsequently assigned to him and Maybel J. Lyerla.  He says, in accepting the assignment of the stock he acted in a personal capacity as the agent to help defendants liquidate their indebtedness to the bank.  The conference above referred to between Hague and Lyerla occurred in the beginning of May, 1923.  On June 4, 1923, Lyerla wired Calmes, the other defendant, as follows:

"Am transferring assets of Leah Coal for its indebtedness.  Will relieve you of same if you will send today corporation stock book, assignment and bill of sale from J. F. Calmes and L. S. Hague to Leah Coal Company.  Also, charter of Leah Company.  Rush wire at our expense."

The language used in this telegram clearly confirms the version given by Hague of the conference held between him and the cashier.  The concluding part of the telegram has a particular significance when considered in connection with what had previously transpired between these parties.  The words "our expense" therein evidently referred to Lyerla and the bank.  These terms would scarcely have been employed if Lyerla had been acting only in

the personal capacity of agent. The proof shows that acting in compliance with the request conveyed in the telegram the defendants sent to Lyerla the corporation stock book, also a bill of sale of the property rights of the defendants to the Leah Coal Company. It is also shown that these assets were disposed of by Lyerla who made no accounting of his administration to the defendants and who did not get a word from Lyerla during a period of about a year and five months when payment was demanded of the balance of the note in question. Such conduct as that on the part of Lyerla clearly indicates that he was acting as owner for the bank of the assets of the Leah Coal Company and not as the agent of these defendants. We have no hesitancy, in concluding from this state of facts that the defendants sold their assets to the bank through Lyerla, its cashier, in payment of their indebtedness and that the latter, nor the bank was acting in the capacity of agent of defendants with the understanding that the proceeds from their coal mine should be applied to the payment of their debt, and that if any balance remained after the application of these proceeds, defendants should be bound therefor.

Counsel for plaintiff makes the point that Lyerla had no implied power by virtue of his office as cashier, to release defendants of their indebtedness to the bank. The law sustains this contention. The evidence in the record leaves no doubt that the cashier in the instant case was given considerable latitude in the management of the affairs of the bank, but there is, however, no proof that he had been expressly authorized by the board of directors to accept a transfer of the assets of the Leah Coal Company in payment of the debt of defendants. The cashier knew, as he testifies, that he had no power to release the indebtedness without authority from the board of directors of the bank. As he knew that, it is hard to believe that he undertook in violation of his duties to make the release in favor of defendants without sanction from his principal. This is possible but not probable. There can be no question that the bank knew that the assets of the Leah Coal Company were being sold by the cashier, or the bank.

In a letter written by Randolph, attorney for the bank, and addressed to defendants, he says that in a letter written to him by the bank, the latter said it was at a loss to understand the tenor of the telegram to Calmes above referred to, because, says the bank, it was not its intention at any time to ask for title in the property for the purpose of cancelling the note, other than to assist in disposing of it and applying the proceeds on the note. The bank unquestionably knew that the cashier had entered into an agreement with these defendants in reference to the cancellation of the note. The only agreement which had been made, as the evidence clearly shows, was that the bank had consented to accept the assets of the Leah Coal Company in payment or extinguishment of its claim. This is the only agreement of which it could have been informed unless we are to infer that the cashier purposely deceived the bank by making a false statement. We can not therefore escape from the conclusion that if the bank had not authorized the cashier to make the agreement for the release of defendants from the obligation on the note, it was certainly informed thereafter of the action of the cashier and received the proceeds from the sale of defendants' assets as owner with the understanding that it would release respondents on the note.

This brings us to the consideration of the case of Bank of Jeanerette vs. Druhlet, 149 La. 505, 89 South. 674, relied upon by

counsel for plaintiff bank. In that case the cashier had been allowing overdrafts for a number of year without any authority being specifically granted him by the board· of directors of the bank. The court found that prior to a meeting of the board in Sept., 1924, the usage of the cashier in permitting these overdrafts had been known to the members of the board and held there was therefore little doubt that the board had acquiesced therein. Continuing further in reference to these overdrafts the court said:

"The directors must be considered to have acquiesced in and authorized the overdrafts which preceded ,the September meeting because we conclude from the circumstantial evidence, to which we have referred, that they were informed."

The direct proof here shows clearly that the cashier accepted a transfer of the assets of the Leah Coal Company for the bank, and agreed to release defendants of their indebtedness, and that if, as contended, the bank had not authorized the cashier to make this release, the circumstantial evidence shows that the bank has acquiesced′ in the action so taken by its cashier, or has ratified the agreement.

Counsel for plaintiff contend that the plea of equitable estoppel can not be maintained unless the person urging it has been induced to alter his position to his detriment. The record shows the bank to have had originally a trust deed bearing on the assets of the Leah Coal Company· as security for its note. Such a deed, as we understand, is of the nature of a mortgage under our laws. It is shown that defendants made a sale or assignment of this deed to the bank, also a transfer of all their stock, corporation books, etc., to it, thus completely divesting themselves of their entire property in their company. Such a contract thus transferring their ownership in the corporate property of their company effected a radical change or alteration in the position they previously occupied, and which could hardly have been but detrimental to their rights. The defendants had certainly irrevocably changed their position and had placed themselves at the mercy of the bank which could, as it is doing now, claim the balance ˙on the note if the purchase proved an unprofitable investment. This change in the position of defendants was the result of the action of the cashier of the bank ˙when he entered into the agreement with Hague at the conference which was held at Herrin in May, 1923. The telegram of June 4, 1923, shows unmistakably that the bank had knowledge of this transaction, and its subsequent conduct in receiving the proceeds realized from the sale of the assets of the Leah Coal Company gives additional proof of its acquiescence in the conduct of its cashier, .and convinces us that it has deliberately ratified the agreement which releases these defendants on their note. The district judge so found, and we see no error in his judgment.

Affirmed.